Patricia A. Ruby Hall v. Commissioner.
Hall v. Commissioner
Docket No. 95329.
United States Tax Court
T.C. Memo 1964-157; 1964 Tax Ct. Memo LEXIS 178; 23 T.C.M. (CCH) 930; T.C.M. (RIA) 64157; June 8, 1964
*178 Petitioner, by trade a professional ice skater, is an employee of the Ice Follies. She is required to travel with the show throughout the United States to 21 cities, except during a lay-off period, without pay, when her employer pays for the cost of travel back to her home city. The Ice Follies stays temporarily in each city, for a short time. Petitioner's employer paid her a weekly travel allowance for hotel lodgings and meals, which was partial reimbursement for those expenses. Held, that the expenses were incurred by the petitioner while she was away from home, and that the entire amount of the expenses is deductible under sections 162(a)(2), and 62(2)(A) and (B), 1954 Code. B. H. Neblett and Loyd C. Larson, 8600 Melrose Ave., Los Angeles, Calif., for the petitioner. Robert L. Gnaizda, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined an income tax deficiency for 1959 in the amount of $926.89. The question is whether petitioner is entitled to any deduction under sections 62(2)(A) and (B), and 162(a)(2), 1954 Code, for traveling expenses while away from home, paid and incurred in connection with her performance of services as an employee. Findings of Fact The stipulated facts are so found and are incorporated herein by reference. Petitioner filed an individual return with the district director of internal revenue at Seattle, Washington. Petitioner's home address during, before, and since 1959 has been and is 3702 West Heroy Avenue, Spokane, Washington. She is a professional ice skater. During 1959, petitioner was employed as an ice skater in the Ice Follies by a partnership, *180 Shipstads & Johnson, which has its only offices and place of business at 8600 Melrose Avenue, Los Angeles, California. The partnership produces the Ice Follies, an ice skating extravaganza or show, which is presented throughout the United States. Petitioner is an employee. For convenience, petitioner's employer is referred to hereinafter as the Ice Follies. Petitioner was first employed by Ice Follies in 1948, when she was 17 years old; and she has been so employed as a member of the cast continuously since then, up to the present time. She has not had any other employment. She commenced as a line skater. She was successively promoted to the roles of junior principal, line captain, and performance director. Her employment has been under written contracts with Ice Follies at all times. The contracts represent three-year agreements. Petitioner and all members of the cast of Ice Follies are members of a nation-wide union, the American Guild of Variety Artists. Petitioner was a member of this union during 1959. The business partnership, Ice Follies, at all times material has had a basic agreement with the American Guild of Variety Artists. The Shipstads & Johnson partnership owns *181 the two buildings where its plant and offices are located. The cost of the buildings, land, and equipment was about $129,000. It employed in the taxable year about 70 workers in its offices and costume production shop, and about 114 individuals in the Ice Follies show of whom around 94 are the performers and the rest are stage hands, electricians, assistants, and managers. Each year a new edition of the Ice Follies is produced requiring new acts, costumes, and music. The show is planned and developed in Los Angeles. Music for it is written by a musician there, and new costumes are made and tried on at the Los Angeles shop. New costumes and show properties, which include large animal costumes worn by skaters, cost $275,000 each year; they are designed and made in the costume shop. The production staff holds meetings and works out the plans for each new show at the Los Angeles offices. Dress and preview rehearsals and the premiere of each new edition of the show are held in Los Angeles. The show is presented there during three weeks each year. All contracts are executed in Los Angeles; the payroll checks are issued there; and all records are kept there. The only office of the Ice Follies *182 is in Los Angeles. Employment contracts often are executed in or near the employee's home city. The Ice Follies was first produced in 1936 and is now in its 28th year. The show features acts and numbers, costumes, music, and highly skilled ice skaters many of whom have won gold medals and championships and have participated in the Olympics. In the show are star performers, principals, and a chorus made up of line skaters. Each [*] edition of the show begins right after Labor Day. For example, the 1960 edition was presented in September 1959. After the new edition for each year is presented in Los Angeles for three weeks, the show goes on tour over a regular circuit which comprises 19 or 20 cities in the United States, and Toronto and Montreal in Canada. The show returns to San Francisco where the last performances of the current edition of the show are given. While performing there, rehearsals for the next new edition of the show are held. The show is presented there 11 or 12 weeks. It was there 12 weeks in 1959. The show then goes to Los Angeles where the new edition is presented. There is a vacation lay-off in the presentation of the show each year for 35 to 45 days, or 5 *183 or 6 weeks. In 1959, petitioner's lay-off was for 35 days, or 5 weeks. The members of the cast are not paid any wages or per diem during the lay-off period. During 1959, petitioner did not receive any wages or per diem during that period. The members of the cast return to their homes during the lay-off period. The Ice Follies pays their transportation fares to their home cities and back to where the show is resumed after the lay-off. The following table shows the schedule of the Ice Follies, the layoff period, and the period of time in each city in 1959. It is typical of the schedule for each calendar year. Petitioner's employment in and assignment to each city was temporary. The following schedule takes into account the time required for traveling from city to city, which often was at night. The show ordinarily is not presented on Mondays. The show goes to Philadelphia each year at some time close to December 25, after spending one week in New Haven, Connecticut, followed by a Christmas recess. Thus, the Ice Follies was in Philadelphia from December 25, 1958, through January 11, 1959, a period of 18 days. In 1959, the show was presented in New York City, 13 days; Syracuse, 7 days; *184 Toronto, Canada, 5 days; Montreal, 8 days; Boston, 13 days; Cleveland, 13 days; Rochester, New York, 6 days. Between the end of the Rochester engagement and the next one in Buffalo, there was a recess of 8 days. Then, the show was presented in Buffalo for 6 days; Minneapolis, 18 days; Seattle, 12 days, followed by the without-pay lay-off of 35 days; San Francisco, June 17-September 6, 82 days; Los Angeles, 21 days; recess for travel, 2 days; Denver, 5 days; Des Moines, including travel from Denver, 7 days; St. Louis, including travel, 7 days; Chicago, including travel, 21 days; Detroit, 14 days; Hershey, Pennsylvania, including travel, 13 days; New Haven, 8 days; Christmas recess 11 days; Philadelphia, 7 days in 1959 and about 11 days in 1960. CALENDAR YEAR 1959.
1958-1959 Edition
Philadelphia
Jan. 1-11
New York City
Jan. 13-25
Syracuse, N. Y.
Jan. 27-Feb. 1
Toronto, Canada
Feb. 2-6
Montreal, Canada
Feb. 8-15
Boston
Feb. 17-Mar. 1
Cleveland
Mar. 3-15
Rochester, N. Y.
Mar. 17-22
Buffalo
Mar. 31-Apr. 5
Minneapolis
Apr. 8-26
Seattle
Apr. 29-May 10
Vacation Lay-off
May 11-June 14
San Francisco
June 17-Sept. 6
1959-1960 Edition
Los Angeles (Premiere of
New Edition)
Sept. 7-27
Denver
Sept. 30-Oct. 4
Des Moines
Oct. 7-11
St. Louis
Oct. 13-18
Chicago
Oct. 21-Nov. 8
Detroit
Nov. 10-22
Hershey, Pa.
Nov. 24-Dec. 5
New Haven
Dec. 6-13
Philadelphia
Dec. 25-31
*185 Under the employment contracts with the performers in the show in 1959, Ice Follies paid each $52 per week as a travel allowance for the expenses of meals and lodging while the employee was away from the town where his or her home and residence is located. This allowance was not paid to an employee while the show was presented in his or her home town, and it was not paid during the vacation period. As a condition of receiving the travel allowance of $52 per week, each employee was required to keep a weekly expense account, to submit it to the Los Angeles office, and to record thereon the amounts paid each day for breakfast, lunch, and dinner, the amounts paid for lodgings, and other expenses. The weekly allowance of $52 represented a per diem of $7.43 in lieu of subsistence. Ice Follies provided each employee in the show with one book for each calendar year containing printed, weekly, expense account forms, in sets of an original and a carbon copy, and required each employee to itemize expenses thereon. The details to be filled in are set forth under the days of the week. The employee filled in the names of the city and hotel; the date on which the week ended (always Sunday); and *186 the amounts expended each day or during the week for lodgings, breakfast, lunch, and dinner; for train porters, trunk and baggage charges, and taxis between the hotel and station; and for hairdress, make-up, skate cleaning and sharpening, and sundry items. At the bottom of each expense account is a space for the employee's signature following certification that it is "a true and correct report of my actual and deductible expenses for the period indicated." On the cover of the account book the following instruction to the employee is printed: To obtain a deduction of traveling expenses from income and payroll tax return YOU MUST itemize your expenses each day and summarize the totals each week. A copy of this report together with paid hotel bills, etc., should be kept by you as proof of the validity of your deductions for traveling expenses, etc. Expense accounts must be submitted every Monday of each week. A secretary with the show collects the expense accounts and mails them each week to the Los Angeles office. The parties are agreed upon the amounts and nature of all of petitioner's expenses or 1959. They appear in her signed expense accounts which are in evidence. A *187 manager of Ice Follies made all of the transportation arrangements and hotel reservations for the tour of the show. Ice Follies paid for train and pullman tickets. He arranged in advance for all members of the touring show to stay at the same hotel and obtained the best rate possible for individual rooms; and he arranged for buses to provide local transportation between the hotel and the arena where the show was presented. The Ice Follies employment contract with the individual performers in the show is for one year with an exclusive option to Ice Follies to renew the contract each succeeding year during two years, so that if each option is exercised the contract amounts to a 3-year contract. The relevant contract between petitioner and Ice Follies was executed on April 5, 1957, and was renewed each succeeding year for a period ending on June 9, 1960, when a new contract was executed. Under the relevant contract, Ice Follies agreed to pay and paid petitioner once a week, $108 for wages, and $52 for travel allowance; a total of $160 a week. Her wages were raised to $118 in April. All members of the cast received the same travel allowance of $52 a week in 1959. All employment contracts *188 required Ice Follies to pay a travel allowance in that amount. It was intended under the contract that this amount was to cover the employee's expenses for meals and lodging while the employee was away from his or her home city. In the case of petitioner, Spokane was her home. The address on all of petitioner's employment contracts is 3702 West Heroy Avenue, Spokane, Washington. There never has been an instance where an Ice Follies performer did not have a home from which he or she departed to join the show, and to which he or she returned from the show. The $52 per week travel allowance represented the maximum amount Ice Follies was obliged to pay in 1959. If an employee itemized in the weekly expense account a larger total expenditure for lodgings and meals, and other travel expenses, Ice Follies did not reimburse the total expense but paid the employee only $52. If the total expense for meals and lodging on the expense account was less than $52, Ice Follies reimbursed the employee only for the actual expense. But no member of the show reported expenses of less than $52 for a full week in 1959 for lodgings and meals, and other travel expenses. The standard employment contract *189 with petitioner and all other members of the cast provided that Ice Follies agreed to provide rail transportation from the employee's home city, as shown in the contract, to the city where the employee was to report to join the show, and thereafter to the various places of performance, and upon the recess in the presentation of the show, back again to the home city. Ice Follies recognized Spokane as petitioner's home, and paid her travel expenses back to Spokane when the show was recessed for the annual vacation period, and from Spokane to San Francisco, at the end of the vacation period. The standard employment contract of Ice Follies with petitioner (and all other performers in the show) obliged the employee to render exclusive services as an artist to Ice Follies wherever Ice Follies might direct; and to render such services as directed by Ice Follies; and to comply with all reasonable rules and regulations deemed necessary by the employer. Under the contract the members of the cast were required to travel to each city where the show was presented, and no employee had any right to determine the city or cities where he or she would perform and render services. Petitioner and *190 all other performers were required to comply with prescribed disciplines, including attendance at rehearsals, skating classes, press conferences, interviews, and meetings for arranging and repairing costumes; and they were required to pay strict regard to make-up and dress, and to perform in such acts and numbers as arranged by Ice Follies. All members of the cast were required under the employment contract to be members of the American Guild of Variety Artists. Also, each agreed not to render services for pay to anyone else except with the consent of Ice Follies, so that the employment contract constituted an exclusive contract with Ice Follies. Petitioner was at all times under the constant supervision of her employer while she was with the show. Petitioner was required by her employment contract to travel to each and all of the 21 cities listed in the above schedule, and to render services to the Ice Follies in each city as and when required by her employer. She was obliged to give 10 performances each week, which included 6 or 7 during the evenings and 3 performances during the daytime, when required. She received additional pay for performances in addition to ten. Rehearsals *191 are during the day. The employment contract is governed by California law. Petitioner and all other members of the cast were paid weekly. The payroll check, the attached voucher, and the payroll record of each employee shows in detail the respective amounts paid for wages and for travel allowance, the respective amounts withheld for income tax, social security tax, and California disability insurance, and the net amount paid to the employee. The amount of withholding for Federal income tax was computed only on the amount of the employee's weekly wages. Under a ruling of the Internal Revenue Service in 1943, in accordance with section 404.14 of Treasury Decision 5277, the amounts paid to all employees in the Ice Follies show for travel expenses were not subject to withholding. This ruling was obtained by both Ice Follies and the union. Ice Follies made a clear segregation of the travel expense allowance from the amount of the weekly wages of each employee on the payroll check and payroll records. During 1959, Ice Follies paid petitioner wages, overtime, and bonuses in the total amount of $5,462.48. Petitioner received in addition the total sum of $2,429.15, travel allowance. There *192 were withholdings from her wages of $1,017.80 for Federal income tax, social security tax, and California disability insurance which reduced her wages to the net amount of $4,444.68. The travel allowance paid by Ice Follies ($2,429.15) represented the weekly allowance of $52 for 46 weeks, or 322 days, $2,392, plus $37.15 for 5 days. Petitioner spent $3,657.91, which she itemized in her expense accounts, for meals, lodgings, taxis between the station and hotel in each city, tips to porters on trains and for carrying luggage, and luggage repairs. These expenses were incurred by petitioner while she was rendering services to the Ice Follies. Petitioner incurred and paid in 1959 certain business expenses for union dues, hairdress, make-up, skating boots and blades and the required care of them, and rehearsal clothes. For these expenses she deducted $557.23. Respondent allowed all of the deduction and there is no dispute about any of them. In her return for 1959, petitioner reported gross income of $7,891.63, ($5,462.48 wages; and $2,429.15, travel allowance). She subtracted from gross income her actual traveling expenses of $3,657.91, plus $8.18, California income tax, or $3,666.09, *193 which resulted in adjusted gross income of $4,225.54. The respondent disallowed all of the deduction of $3,666.09 because it had not been established that it constituted ordinary and necessary business expense paid and incurred while traveling "away from home." In fact, the deduction of $8.18 for California income tax, included in $3,666.09, was inadvertently a duplication and therefore represented a double deduction to which petitioner was not entitled. She included this $8.18 in her Schedule B. Itemized Deductions, in her deductions for taxes, all of which respondent allowed. Respondent did not err in disallowing the deduction of $8.18 on page 1, line 1 of the return. The issue presented relates only to the balance, $3,657.91, which petitioner deducted as business travel expenses. Petitioner reported in her 1959 return taxable income of $2,838.27, and income tax of $584.42. Her employer had withheld $861.80 for Federal income tax. She therefore reported an overpayment of income tax of $277.38, and she requested refund of that amount. Petitioner paid $8.18 California income tax in 1959, which apparently was necessary because all of her income was from sources within California. *194 See West's Annotated California Codes, Vol. 61, Revenue and Taxation, page 101, sec. 17041. Petitioner spent $3,657.91 in 1959 for the following expenses incurred while she was rendering services to the Ice Follies: Hotel lodgings
$1,647.08
Meals
1,900.67
$3,547.75
Taxis between stations and
hotels
63.10
Tips to porters
43.50
Luggage repairs
3.56
110.16
$3,657.91 Petitioner's meals and lodgings expenses of $3,547.75 exceeded by $1,118.60, the reimbursement paid by the Ice Follies of $2,429.15. Petitioner was born in 1931. Her home has always been in Spokane. She lived with her mother (and her father, until he died in 1937) at 3814 West Heroy Avenue, until 1941. In 1941, the family moved to 3702 West Heroy Avenue, and petitioner's home has been at this address continuously since 1941 up to the present time. Petitioner was married to Arthur F. Hall on November 10, 1951. She and her husband resided only at 3702 West Heroy Avenue at all times, and they did not reside at any other place. Petitioner obtained a divorce in Spokane from her husband which became final on September 26, 1957. The Court which granted the divorce made a finding of fact that *195 Patricia was and had been a resident of Spokane, Washington. The house at 3702 West Heroy Avenue is a 6-room house, with 3 bedrooms. At all times, including the years 1948-1959, inclusive, up to the present time, petitioner has had possession of her own bedroom in this house, which is kept apart for her use and benefit at all times. There is a 2-car garage on the property where petitioner keeps her own automobile at all times, except when she leaves it with her sister in California during the winter. Petitioner keeps all of her personal belongings at her home in Spokane, at the above address, and she did so throughout 1959. Her personal belongings, which she purchased, include some furniture, dishes, linens, blankets, electric appliances, and a power lawnmower. Petitioner keeps her clothing at her home in Spokane. She takes on her trips away from home, when she is away from Spokane with the Ice Follies, only necessary clothing. Petitioner bought an automobile in Spokane in 1958. The address in the registration of the automobile is 3702 West Heroy Avenue; the automobile was so registered in 1959. Petitioner is and in 1959 was a registered voter in Spokane. In 1959 and other *196 years, petitioner paid part of the household expenses, and she also has paid for improvements, a sewer assessment, and real estate taxes at 3702 West Heroy Avenue. She contributes about $600 a year for the household expenses. In 1959, petitioner contributed about $600 for such expenses, and, in addition, she provided the funds for the purchase of two storm doors for the house, the purchase of an electric lawn mower, she paid $206 for having the house connected with the city sewer lines, and she paid some of the bills for utilities such as water and electricity. Petitioner stays at her home in Spokane throughout each annual vacation period of the Ice Follies, 5 or 6 weeks each year, and she did so in 1959. In addition, petitioner stays at her home in Spokane when the Ice Follies is presented there, and for a few days when en route to Seattle. It is, and at all times it has been, her intention to return to her home at 3702 West Heroy Avenue, Spokane, in the event her employment by Ice Follies is terminated, or when she resigns from such employment. Petitioner's employer recognizes the above address as her home. Spokane is petitioner's home city for business purposes. Petitioner incurred *197 deductible expenses while away from home for meals and lodging in the amount of $3,547.75, and for transportation costs in the amount of $110.16, including $3.56 repairs of luggage used in business travel. Opinion At the trial, the respondent stated the issue in the following way: "If Miss Hall does not have a home in Spokane, Washington, then she must be disallowed the entire amount [of the claimed deduction]. * * * The question is, were they incurred away from home, and if they were, then they were totally allowable. If they were not, then they were totally disallowable." The parties are now agreed that petitioner made the expenditures for the items and in the amounts set forth in the findings. There is no dispute about the general facts. Respondent's position is that since petitioner's services as an employee were rendered in 21 different cities in 1959 she is precluded from having a home, the expenditures were not incurred away from home because her home was wherever she happened to be, and the expenditures are nondeductible personal expenses. See sections 162(a)(2), 62(2)(A) and (B), 1954 Code. The evidence establishes that petitioner's home city for business purposes *198 as well as the place of her residence was and is Spokane, Washington, and that she was employed to appear temporarily in the cities in the circuit of the Ice Follies as a member of the cast and to travel with the show. Her absence from Spokane was temporary. Respondent's attempt to stretch Commissioner v. Flowers, 326 U.S. 465, to cover this situation must fail. It is held that the expenses in question were incurred by petitioner while she was away from home. Respondent also relies on James v. United States, 308 F. 2d 204 (C.A. 9, 1962). The James case on its particular facts is distinguishable from this case. The question here is chiefly a fact question. Each case must be decided on its particular facts. Neither party has cited any case in which the facts closely resemble the facts in this case. However, in principle, we regard the following cases as applicable and as support for the claimed deduction: Harry F. Schurer, 3 T.C. 544, 546; Charles G. Gustafson, 3 T.C. 998; and Alois Joseph Weidekamp, 29 T.C. 16, in which the Commissioner acquiesced as to the result, 1958-2 C.B. 8. Petitioner is a professional *199 ice skater and a member of a union. Like Schurer she accepted employment away from her home city, no doubt because she could not earn her living at her trade as profitably if she attempted to do so in that vicinity. She accepted employment by the Ice Follies under its terms set forth in a standard form of contract which incorporated by reference the terms of a basic agreement between the union and Ice Follies. She was required to maintain membership in a nation-wide union, American Guild of Variety Artists. The terms of the employment contract apparently were satisfactory to the union. She could not exercise any preferences about the provisions of the employment contract. There are three provisions in the employment contract which are of particular significance, to which the respondent has not accorded sufficient weight, as follows: First, the employment contract is written so as to specify that the employee's home city is the "point of engagement." This means, for one thing, that the employee is hired at his home city, and the employer agrees that the employee is to return to his home city. Second, the employee is to receive wages only while performing in the show, subject to a *200 guaranty of 15 weeks' employment. The evidence shows that in practice this clause means that no wages are paid during lay-off periods, of which there is at least one every spring for 5 or 6 weeks. (In 1959, it was 5 weeks.) Third, the employer agrees to pay for the employee's rail transportation from the point of engagement, the home city, to the place where the employee joins the show, and back to the home city point of engagement when the show closes, which in practice includes the time when there is a lay-off during a recess. The show is not presented continuously throughout the year. It must be recognized that the Ice Follies show is presented on a seasonal basis with a spring lay-off without pay. In accepting employment, the employee agreed to travel with the show when and as directed, and the employer agreed, at his own expense, to get the employee back to his home city at the beginning of the lay-off period, and thereafter to arrange for his transportation from his home city to the place where the show was resumed after the lay-off. Also, it was understood in advance that the show would be presented in each city for only a short period and the employee would be in each city *201 only temporarily. Under these circumstances, the employment contract fixed the employee's home city as his place of employment and home base, and for practical reasons, from the viewpoint of each party, the employer and the employee, this was necessary. Since the employee does not receive wages during the lay-off, he needs to have a fixed home base; and since the Ice Follies only releases the employee for a recess (without pay) it must be assured that the employee will rejoin the show after the recess. The respondent is incorrect in taking the position that petitioner did not have a home city, a home for business purposes, within the meaning of section 162(a)(2). The employment contract of the Ice Follies, which petitioner was obliged to agree to in order to have her job, is adapted to the way in which the Ice Follies conducts its business and presents a show on a seasonal basis in various cities. Respondent's contentions are the result of a rigid construction of the statute. But the respondent may not expect that every business enterprise and its employees are able to fit into a mold, the form of which is prescribed by the respondent. If that were required, the intended purposes *202 of section 162(a)(2) would be greatly limited by the respondent's inflexible construction of the statute under various fact situations. It is our best judgment that under the present particular facts and circumstances, this is a Schurer type case and the same result should be reached here, as in Schurer, even though there are some differences in the facts. Illustrative of the importance of the three elements in the employment contract, noted above, are the facts that petitioner's earnings were $540 less than they would have been ( $108 per week was not paid for 5 weeks) if there had not been a 5-week lay-off without pay; she returned to Spokane during the lay-off; and the Ice Follies paid her round-trip fare, to Spokane and back to the place where the show was resumed, on account of the seasonal lay-off. In Schurer, pages 545-546, we noted some of the legislative background of the enactment in the Revenue Act of 1921 of the provision allowing deduction of traveling expenses, of which section 162(a)(2) is a counterpart. See Seidman's Legislative History of Federal Income Tax Laws 1938-1961, p. 822. The measure as originally enacted was explained by a member of the House Ways and *203 Means Committee, inter alia, as "a measure of justice" for the benefit of the commercial travelers of the country. See, also, Williams v. Patterson, 286 F. 2d, 333, 334-336, (C.A. 5, 1961) where the court, in reviewing the legislative history of section 23(a)(1)(A), 1939 Code, observed "that Congress expressly repudiated a narrow view of the deduction. The Act allows the full amount expended to be deductible * * *. Moreover, there is no express statutory limitation, even as to reasonableness. * * * Between these extremes, * * *, there are innumerable borderline situations, * * *, that cannot be measured by the length and breadth of a thumb [rule of thumb]." And this Court in Gustafson, supra, p. 999, where the taxpayer traveled in his business 52 weeks of the year, said: Such expenses of a man traveling in the pursuit of his business are of course living expenses, since they are paid for lodging and meals; but it can not be supposed that the statute paradoxically allows the deduction of traveling expenses and at the same time prohibits the deduction because they are personal and living expenses. Eating and sleeping are as necessary and inevitable expenses *204 of pursuing the business as is riding on trains, and it would be quite inconsistent to classify one among the allowable traveling expenses and the other among the nondeductible living expenses. Under the facts and circumstances, which make this a borderline case, respondent has taken a narrow view of the facts and circumstances under which Ice Follies conducts its business and hires employees, and has failed to give due consideration to the relationship between the Ice Follies, as employer, and the union to which all of the employees belong. The problem here lies within a narrow zone. We believe it closely resembles the situation which exists where an individual engages in a trade which necessitates his belonging to a union and accepting employment for short periods away from his home city and area, where he maintains a fixed and permanent residence. Cf., Harry F. Schurer, supra; and Hartsell v. Wright, 182 F. Supp. 725, affd. 305 F. 2d 221 (C.A. 9, 1962) (not cited by petitioner). In applying sections 62(2) and 162(a)(2) to various situations, there does not appear to be a single rule which will correctly fit every case and it is necessary *205 to decide each case on its particular facts under general principles. The three conditions for allowing a deduction for travel expenses which are set forth in Commissioner v. Flowers, supra, are complied with here. The traveling required of petitioner by her employer was the essential and primary requirement of her employment. The traveling of petitioner was solely in the pursuit of her employer's business. All of the amounts expended by her during 1959, for meals, hotel lodgings, station-to-hotel-and-return taxi fares, tips to porters, and repairs of luggage used in traveling, were incurred in order to meet the exigencies and demands of her employment and the exigencies of her employer's business. She was required to sleep where her employer arranged hotel accommodations during the tour, and to eat at such times as to be ready and able to perform in the show. Sections 62(2) and 162(a)(2) allow the deduction of meals and lodging expenses incurred while away from home in the pursuit of a trade or business, which otherwise are treated as nondeductible personal living expenses, Charles G. Gustafson, supra, and the statute does not impose any limitation upon the *206 deduction dependent upon the length of time the individual is in travel status. The comptroller of the Ice Follies testified that while the members of the cast are on active duty (i.e., paid wages) there is no period when the show is not being presented except when traveling and during a brief recess at Christmas time, and that all rehearsals (which are held during the daytime) take place while the show is being presented. Accordingly, with respect to the issue presented, it is of no significance that the employees are in a few cities for a longer time than in others. In summary: Petitioner did not abandon her permanent home in Spokane at any time. She continously contributed to its upkeep and maintenance. She intended to return and returned to Spokane, and to her permanent residence there, each year during the lay-off and at other times, whenever possible. That she would return to Spokane during the lay-off period was part of the employment contract. She had a business home base in Spokane, as well as her personal home, for the relevant purpose of sections 62(2) and 162(a)(2). She was neither a homeless nor an itinerant individual. Petitioner's employment by the Ice Follies was *207 upon the condition that she would travel with the show wherever and whenever directed, and it was known in advance that in each city the employment would be for a temporary period. Petitioner could not move her residence to her places of employment and, on the other hand, she needed to have a home city for business purposes and to maintain a home there to which she could return during the lay-offs without pay. She had no choice about the cities where she would perform, and was under the constant supervision of her employer who imposed rigid disciplines. Under the particular facts of this case, we hold that the disputed expenses were away-from-home traveling expenses. Under the employment contract, the $52 weekly allowance, a per diem of $7.43, was intended for meals and lodgings expenses. Petitioner's actual expenses for these purposes, $3,547.75, an average of $10 or $11 a day ($3,547.75 for either 322 or 327 days), are deductible. The other expenses of $110.16 for taxis, tips, and luggage repairs are deductible traveling expenses. Respondent erred in disallowing a deduction of $3,657.91. There is a slight adjustment, disallowance of a duplicate deduction of $8.18, which increases *208 petitioner's taxable income to $2,846.45, and the tax to $590.18. This results in a deficiency of $5.76 (not taking into account $861.80 withheld by the employer during the taxable year). Decision of $5.76 deficiency in income tax will be entered.